# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:17-cr-00015 |
| | ) | Judge Aleta A. Trauger |
| ANTONIO M. PORTER | ) | |
| | ) | |

## MEMORANDUM AND ORDER

Antonio M. Porter has filed a Motion to Suppress evidence found during a search of his home on July 25, 2017. (Docket No. 27.) The court held an evidentiary hearing on the motion on March 15, 2018, after which Porter and the United States filed post-hearing briefs. (Docket Nos. 43, 46, 47.) For the reasons set out herein, Porter's motion will be denied.

## I. BACKGROUND

At around 4:20 in the morning on July 25, 2017, three Pulaski Police Department ("PPD") officers—Patrol Officer Adam Oglesby, Patrol Officer Andy Griggs, and Lieutenant Justin Young—approached Porter's home to execute an arrest warrant on Porter. (Docket No. 42 at 20.) The officers parked a street over and made their way to the home, passing first through the back yard. (*Id.* at 95.) Lieutenant Young described the home as follows:

> It's in a residential neighborhood. The house sits at the end of a city street, on the right shoulder of the road. It is a double-wide mobile home and clearly marked . . . on the front door—correction, above the front door. . . . [T]o the rear of it, there's a residence probably 40 yards behind it on the adjoining street. In front of it, a residence sits across the street, and there's one to the—it would be to the north that would probably be about 20 to 30 yards away as well.

(*Id.* at 20–21.) A photograph of the front of Porter's home that was admitted into evidence shows the double-wide apparently mounted on a stationary stone base, which would require a visitor

approaching the front door of the home to ascend a few wooden steps onto a small, railed wooden porch. (Ex. 5.)

Lieutenant Young went to the front door, while Officer Griggs went to the back door and Officer Oglesby remained on one side of the house. (Docket No. 42 at 21–22.) Lieutenant Young knocked on the front door and got no response. He then went around and joined Officer Griggs at the back, where he knocked on that door. After a short time, Lieutenant Young heard a male voice through the door asking who was there. Lieutenant Young replied that it was the police. At that point, Lieutenant Young returned to the front door, where he was joined by Officer Oglesby. Officer Oglesby knocked on the front door while Lieutenant Young stood on the stairs of the porch. (*Id.* at 22–23.) Porter's girlfriend, Dezaray Furr, opened the front door. (*Id.* at 24.) When asked how widely Ms. Furr had opened the door, Lieutenant Young said that she had opened it "probably 10 inches, just cracked the door enough to look out of [it]." (*Id.* at 25.) Ms. Furr was "standing behind the door with her face looking out." (*Id.*)

Lieutenant Young testified that, prior to Ms. Furr opening the door, he had not smelled any odor of marijuana on the premises. (*Id.*) However, "[w]hile speaking with Ms. Furr," he testified, he "could smell an odor of marijuana coming from inside the residence." (*Id.*) He estimated that he was one or two feet away from the door itself at the time, having ascended the stairs to the porch. (*Id.* at 25–26.) He testified that he had no basis for believing that the smell was coming from anywhere other than the residence and rated the strength of the smell as "a 5 or a 6" on a scale of 1 to 10. (*Id.* at 26–27.)

Officer Oglesby also testified that, prior to Ms. Furr opening the door, he had not detected any odor of marijuana, but, "[o]nce the door had opened, and [he] began speaking with her, [he] detected the odor of what [he] knew to be marijuana." (*Id.* at 96.) He testified that he

initially thought he detected what he thought was the smell of green marijuana, but, the longer he stood on the porch in front of the opened door, the more he "detected a smoky odor . . . [o]f burnt marijuana." (*Id.* at 96.) On the same scale of 1 to 10, he placed the smell at a 5. (*Id.* at 97.)

Ms. Furr went back into the house momentarily and returned with Porter. (*Id.* at 27.) Lieutenant Young explained to Porter that the officers were there pursuant to an arrest warrant. Porter exited the home without incident and was placed under arrest on the front porch. (Id. at 28.) At some point during their interactions with Porter and/or Ms. Furr, the officers came to learn that there were several children inside the house. (*Id.* at 33, 101.)

As Lieutenant Young was taking Porter to his patrol vehicle, Porter mentioned that his home had recently been "shot up." (*Id.* at 29.) Porter showed Lieutenant Young bullet holes in the exterior of the home associated with the shooting. After that brief detour, Lieutenant Young took Porter the rest of the way to the patrol car and placed Porter in the rear. Lieutenant Young testified that, once inside the car, he asked Porter for his consent to search the home. Porter said that he would allow officers to search some, but not all, of the home. Lieutenant Young rejected that proposition and informed Porter that he could either consent to a full search or the police "would have to get a search warrant for the residence." (*Id.*) Porter did not consent to the search. Lieutenant Young testified, however, that Porter did volunteer an explanation for the marijuana odor in the home—specifically, that he had smoked "a marijuana cigarette . . . before he went to bed" and "there might be a blunt left in the residence." (*Id.* at 30.)

At some point immediately or shortly thereafter, Lieutenant Young stepped out of his car and called Lieutenant Joey Turner, an officer in PPD's criminal investigation division. (*Id.*) Lieutenant Young described the situation generally, including the odor of marijuana and Porter's decision not to consent to a search, and requested that Lieutenant Turner send a drug investigator

3

"to come draft a search warrant." (*Id.* at 31.) After the call, Lieutenant Young testified, he informed Officers Oglesby and Griggs that a search warrant would be forthcoming and instructed them to "to make sure nobody else was inside the residence." (*Id.*) When asked whether it was common practice for PPD to enter into a residence to "secure" it prior to obtaining a warrant, Lieutenant Young responded that it was. He identified officer safety and preventing destruction of evidence as the reasons for doing so.[1] (*Id.* at 33.) Lieutenant Young conceded that he had no reason to believe Ms. Furr might be armed and dangerous, other than her association with Porter.[2] (*Id.* at 34–35.)

After his instructions to Officers Oglesby and Griggs, Lieutenant Young left to transport Porter to the county jail. (*Id.* at 34.) Lieutenant Young testified that, while he was transporting Porter, he received a call from Investigator Kenneth Bass, the drug investigator who had been called on for the preparation of the warrant application for Porter's home. According to Lieutenant Young, he explained to Investigator Bass, "that while placing Porter into custody, we

---

[1] Specifically, Lieutenant Young testified as follows:

> Q. Is it common practice in your department to secure a residence prior to the issuance of a search warrant?
> A. Yes, it is.
> Q. Why is that?
> A. For officers' safety.
> Q. What do you mean by that?
> A. Means when we do actually enter the residence with a search warrant, there's not somebody that's barricaded themselves in the house or hiding in an attempt to hurt us when we enter.
> Q. Is there any other reason to conduct a security sweep of a residence prior to the issuance of a search warrant?
> A. Yes, there is. To keep individuals from inside the house [from] destroying evidence or discarding evidence.

(Docket No. 42 at 33.)

[2] The warrants for Porter's arrest were for charges of aggravated assault and vandalism. (Docket No. 42 at 20.) He was charged with "shooting at some individuals in a vehicle" and was a known gang member. (*Id.* at 35.)

4

could smell the odor of marijuana coming from the residence." (*Id.* at 36.) When asked specifically whether he had told Investigator Bass that the residence "was going to be secured prior to the issuance of a search warrant," Lieutenant Young responded: "I believe I told him that the residence would be secured, and we'd be waiting on him." (*Id.* at 37.) Lieutenant Young testified that "to secure a residence," in the ordinary parlance of his PPD colleagues, "[m]eans just to make sure there's nobody still inside the residence, keep people from coming in," which officers would accomplish by entering the residence and doing a "protective sweep." (*Id.*)

Investigator Bass testified that he had been at home, in bed, when he received a call from his supervisor describing the situation at the Porter house. He got up and, while on his way to the police department, placed the aforementioned call to Lieutenant Young. (*Id.* at 133–34.) His description of the conversation was substantially similar to Lieutenant Young's. (*Id.* at 134–35.) Investigator Bass testified that he had had some familiarity with Porter before July 25, 2017, including that Porter had been the subject of an arrest involving possession of marijuana for resale in 2012. (*Id.* at 132.) Investigator Bass also testified that, through unnamed informants, police had "learned that [Porter] had been selling marijuana." (*Id.* at 136.) After his call with Lieutenant Young, Investigator Bass drafted an application for a search warrant. The affidavit reads, in relevant part:

> [O]n July 25, 2017, while patrol officers from the Pulaski Police Department were serving felony arrest warrants for Antonio Porter[,] Lt. Young, Ptl. Griggs, and Ptl. Oglesby made contact with Antonio at his residence . . . . Antonio came to the door and while speaking with him and placing him under arrest Officers could smell a strong odor of marijuana coming from [t]he residence. Officers ask[ed] Antonio if they could have consent to search the residence at that time due to the strong order of marijuana coming from inside the residence. At that time Antonio told them no they could not search. Based on the officers['] training and experience to know the odor to be marijuana[, t]he residence was secured and arrangements to obtain a search warrant were made. During the time the residence was secured there was still an[] odor of marijuana that could be smelled by officers. Based on my experience and information I have learned Antonio is

5

known to be associated with illegal narcotics and the officers telling me there is an odor of marijuana coming from the residence, I believe there to be more marijuana inside the residence.

(Docket No. 27-4.) Investigator Bass testified to his understanding of the term "secure the residence" and confirmed that, "[n]ormally, when they tell me they've secured it, I'm under the assumption they went inside, secured it, made sure nobody was inside, and everybody is brought outside." (Docket No. 42 at 158.) After obtaining approval of the warrant from the magistrate on call, Investigator Bass went to Porter's home to execute the warrant. (*Id.* at 135–46.)

Meanwhile, after dropping Porter off at the jail, Lieutenant Young had returned to Porter's home. He found Officers Griggs and Oglesby, along with Ms. Furr, standing on or near the front porch. Shortly thereafter, Porter's mother arrived to pick up the five children who had been sleeping inside the home. Officers Oglesby and Griggs accompanied Ms. Furr into the house during the two trips it took to retrieve the five children. (Docket No. 42 at 38–40.) Lieutenant Young testified that, to his knowledge, the officers did not perform any form of search while in the home prior to obtaining a warrant. (*Id.* at 40.) Officer Oglesby confirmed that he did not perform any search or see any contraband in the house.[3] (*Id.* at 105.)

Not long thereafter, Investigator Bass arrived with the search warrant. Lieutenant Young, Officers Oglesby and Griggs, Investigator Bass, and another investigator searched the residence. Lieutenant Young found a "burnt marijuana cigarette, a roach [in] a change jar that was sitting on the kitchen counter next to the sink." (*Id.* at 40–41.) In the living room, the officers found another burnt roach—this one on an end table—as well as a digital scale in a drawer. In one of the bedrooms, where the children had been sleeping, they found two firearms: a 9-millimeter handgun under a mattress and an SKS 7.62 rifle in the closet. (*Id.* at 41, 43–44.) Porter has been

---

[3] It was not the case here (as it sometimes is) that the officers justified the search warrant by claiming that they saw incriminating evidence, "in plain view," while securing the house.

charged with being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) & 924.

## II. ANALYSIS

The parties have devoted a substantial amount of briefing to the question of whether Officers Oglesby and Griggs were acting lawfully when they entered Porter's home to secure it prior to obtaining a warrant. Neither party, however, has identified any evidence that the government wishes to rely upon that was discovered during those entries, nor was anything that Officers Oglesby or Griggs perceived during that time a part of the probable cause affidavit. This case, then, is not an appropriate vehicle for considering precisely what is permissible and what is not in the realm of precautionary sweeps.

The only link that Porter has identified between the pre-warrant entries and the eventual incriminating search is that Investigator Bass's language in the affidavit did not clearly convey that the officers had already entered the home, choosing instead to state only that "[t]he residence was secured." Investigator Bass's euphemistic language, Porter argues, draws his and the other testifying officers' credibility into doubt. The court, however, found the testimony from Lieutenant Young and Investigator Bass credible with regard to their claim that, at least in the professional language that they and the other PPD officers routinely used,[4] "securing" a home necessitated going inside of it. Even to a layperson, it certainly seems far from clear that the language used by Investigator Bass gives any impression that the officers did not enter the home. If Investigator Bass had instead said, for example, that officers "secured the perimeter" of the home, that language would have been misleading. The court, however, finds no reason to

---

[4] "Securing the residence" is not jargon unique to this police department. The court has heard officers from many jurisdictions describe this process, which is rationalized on the basis of officer safety and to avoid the destruction of evidence by others who are within the house. This is a term with which the issuing magistrate, in all likelihood, was very familiar.

7

conclude that the language actually used draws the officers' credibility into doubt or undermines the validity of the warrant, which was based on the pre-entry detection of the smell of marijuana emitting directly from the opened doorway of the home.

Porter argues next that probable cause did not exist to search the home based solely on the marijuana smell. The parties agree that the Sixth Circuit has never decided whether a smell of marijuana emitting from a home is, in and of itself, sufficient to provide probable cause for the search of a residence. *But see United States v. Elkins*, 300 F. 3d 638, 659 (6th Cir. 2002) (finding probable cause based on smell of marijuana plus anonymous tip that residents were growing marijuana); *United States v. Talley*, 692 F. App'x 219, 222 (6th Cir. 2017) (finding probable cause based on smell of marijuana plus small amount of marijuana found in the trash and criminal history of a resident). The Tenth Circuit has held that an officer's smelling of marijuana from a residence, combined with prior reports of laypeople's smelling of marijuana from that residence, is sufficient. *See United States v. Garcia-Zambrano*, 530 F.3d 1249, 1259 (10th Cir. 2008). The Sixth Circuit has at least suggested that odor alone "may" be sufficient to justify a home search and has held consistently that odor is sufficient to create probable cause to search a vehicle. *Elkins*, 300 F.3d at 659 ("This court has held that an officer's detection of the smell of marijuana in an automobile can by itself establish probable cause for a search. The same may be true when marijuana is smelled within a home.") (citing *United States v. Garza*, 10 F.3d 1241, 1246 (6th Cir. 1993); *United States v. Tobin*, 923 F.2d 1506, 1512 & n. 4 (11th Cir.1991); *United States v. Gonzalez*, No. 94–6503, 1995 WL 626286, at *3 (6th Cir. Oct. 24, 1995) (finding reasonable suspicion to detain suspect based on smell of marijuana emitting from motor home during traffic stop); 2 LaFave, *Search and Seizure* § 3.6(b), at pp. 290–92).

In any event, there are a number of contextual factors in this case that render the officers' perception of the smell particularly indicative of a likelihood of marijuana inside the house. First, the officers approached the home from multiple angles, spent a meaningful amount of time outside the home before the door was opened, and perceived no marijuana smell until the moment that Ms. Furr opened the door. This case, therefore, is considerably different from one where officers arrived on the scene to find a preexisting marijuana smell that could have plausibly come from a previously parked vehicle or individuals on foot outside. Second, the officers testified at length about the layout of the house and neighborhood, including the proximity of other homes adjacent to Porter's, and that testimony does not suggest a significant risk that the officers may have been misidentifying the source of the smell. This case, then, is distinguishable from one where an officer might, for example, smell marijuana in the hallway of an apartment building or in the narrow space between two homes with adjacent windows. Third, the hour, combined with the residential character of the neighborhood, suggests a relatively low likelihood that a marijuana smell could have come from a passerby. Fourth, more than one officer was present at the doorway and confirmed the marijuana smell. Fifth, there was at least some pre-warrant confirmatory background information consistent with Porter's connection to the use or sale of marijuana. The court, moreover, found Lieutenant Young, Officer Oglesby, and Investigator Bass all to have been credible witnesses, and they established sufficient basis in their training and experience for being able to identify the smell of marijuana. Based on all of these situation-specific factors, the court concludes that the officers did, in fact, have probable cause for the search.

In any event, even if the information supporting probable cause were to fall short, the fruits of the search in this case would be admissible because the evidence was discovered during

the good-faith execution of a seemingly valid warrant. "When evidence is obtained in violation of the Fourth Amendment, the judicially developed exclusionary rule usually precludes its use in a criminal proceeding against the victim of the illegal search and seizure." *Illinois v. Krull*, 480 U.S. 340, 347 (1987). The purpose of the exclusionary rule, however, is not to redress the injury to the privacy of the search victim, as "[t]he ruptured privacy of the victims' homes and effects cannot be restored. Reparation comes too late." *United States v. Calandra*, 414 U.S. 338, 347 (1974) (quoting *Linkletter v. Walker*, 381 U.S. 618, 637 (1965)). Instead, "the rule's prime purpose is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures." *Id.* The exclusionary rule, therefore, is subject to certain exceptions related to situations where its deterrence would be limited. In particular, if the evidence in question was "obtained in objectively reasonable reliance" on the "subsequently invalidated search warrant," it should not be suppressed. *United States v. Leon*, 468 U.S. 897, 922 (1984).

But the good-faith exception rule is itself subject to exceptions. Specifically, the good-faith exception does not apply in four situations:

> (1) when the affidavit supporting the search warrant contains a knowing or reckless falsity; (2) when the magistrate who issued the search warrant wholly abandoned his or her judicial role; (3) when the affidavit is so lacking in indicia of probable cause that a belief in its existence is objectively unreasonable; or (4) when the warrant is so facially deficient that it cannot reasonably be presumed valid.

*United States v. McPhearson*, 469 F.3d 518, 525 (6th Cir. 2006) (citations omitted). Porter has argued that the first of these exceptions applies, because Investigator Bass did not adequately disclose that the officers had entered Porter's residence without a warrant. The court, however, finds that Lieutenant Young and Investigator Bass testified credibly about their understanding of what the language used was intended to and would, to a knowledgeable reader, convey.

Moreover, the court does not find the language objectively misleading in its terminology. Porter also argues that the third exception applies, because the affidavit lacked indicia of probable cause. As the court has already discussed, however, the case law of this circuit has strongly suggested that the smell of marijuana identifiably emanating from a home may, in appropriate situations, be sufficient to support probable cause. The affidavit, therefore, was premised on a reasonable interpretation of the law as it stands and as it stood at the time. The evidence discovered pursuant to the affidavit, therefore, will not be suppressed.

## IV. CONCLUSION

For the foregoing reasons, Porter's Motion to Suppress (Docket No. 27) is hereby **DENIED**.

It is so **ORDERED**.

ENTER this 1st day of June 2018.

*[signature]*

ALETA A. TRAUGER
United States District Judge